All right. Are you ready for Kaseburg? Yes. Thank you, Your Honor. I don't know if the panel has a particular place they'd like to start in Kaseburg. Let me start by asking about the Court of Federal Claims. My understanding is the following. You've got, as of January 26th of this year, the District Court here has approved with the concurrence of the Federal $36,521.65 in interest, with interest accruing at the rate of 4.2% compounded annually from the dates of taking with respect to individuals who were part of this action. They took something. What did they take? They took a reversionary interest. They blocked a reversionary interest in land that was supposed to be triggered when the underlying easement was extinguished. Okay. So then the Trails Act clearly is relevant there, right? Certainly. You don't dispute this federal jurisdiction? That's the cause of action is under the Little Tucker Act, and it's because of what happened from the Trails Act. That is an element of the claim in that case. So in this one, you do agree the Trails Act is key? No. Well, in a takings case it is. Right. But I mean, you can't have it both ways. Either there's something to take, and the government, at least in the Federal Court of Claims, concluded that something was taken. That's, even here, that's a lot of money. I think it is a lot of money. It's valuable property. But there's a difference between the parties' rights in the two cases. In one case, you're talking about the plaintiff's reversionary interests. They were supposed to get use, possession, and control of that land pursuant to state law when the easement was extinguished. But the Trails Act steps in and blocks that reversionary interest. When you read those cases about Trails Act, that's what they're about, is the plaintiff's reversionary interest being blocked. That's different from the defendant's easement and what happens to that. But wasn't the easement part of what was taken? No. The easement was not taken. All right. So you're saying in the Court of Federal Claims, the only thing that was claimed by these plaintiffs was an interest in a fee that was somehow taken as well by the Trails Act. Is that right? Yeah. Well, technically, what's taken is the right to use, possession, and control, that reversionary interest to reclaim that land. Well, you're talking to the middle line? Yes. So you're saying that the Court of Federal to the middle of the railroad easement if the Trails Act did not come along? Well, there was a settlement. I understand that. But the settlement was based upon a taking of something. Yes. But my point is there wasn't a final finding on Centerline. There was briefing, substantial briefing about the Centerline presumption. And where there were meets and bounds, that issue was reserved for trial. And the Court there, and believe me, the Department of Justice lawyers are perfectly well capable of arguing good stuff. And we had our hands full. And that same argument was presented to Judge Leto, and he decided change of title did not need to be presented. So basically, the change of title wasn't mentioned in the settlement. Basically, the settlement occurred because nobody wanted to go to trial on this and doesn't have any impact on this case. I don't think it has an impact on this case except as persuasive authority on some of the legal issues. Can I ask just a quick question on subject matter jurisdiction? I assume you're not taking the view that the outcome of that issue would differ from the two cases. I think it's exactly the same. It's the same, right? I just want to be clear. I do. Yes. Well, the issues in Caseburg are largely the same on subject matter jurisdiction, on chain of title. And I guess I'd like to talk about chain of title a little bit more because in Caseburg, we obviously took the position based on our experience in so many trails cases that you don't need to present chain of title. If we have the centerline presumption, that's up to the defendant to get them. And so, of course, the court disagreed with us. The court actually sanctioned you, did it opinion that we should have produced, we should have had them to begin with. Now, we didn't have them in our possession when we objected to discovery. We didn't get them until later when we needed to try to get them to maintain our case and we chose to get four representative chains of title believing that they would, we would be able to prove, have many trials later and prove those and not have to incur the expense for all the plaintiffs for all that they're going to do. But to the merits of the issue, it, I guess it mostly is the same as the Hornish case, just that there's more, more plaintiffs. And so I do think that the Haggart case and Judge Selma's decision in a case from the Central District of California in a case we were involved in, where he also, he sort of rejected the Hornish and Caseburg analysis that was presented to him to say, well, no, this isn't a question of standing. They can come into court and argue what they want when they present their ownership deeds. And so they may or may not show ownership, but it's, it's not required that they come in with a chain of title just to have standing. And so I think that Hornish and Caseburg were sort of followed each other, are really outliers on this whole chain of title issue. What about the standing aspect of it? I mean, the court, after going through all of this, concluded, hey, you know, without proving that you own what you say you own, you don't have standing. Goodbye. To me, it seems putting cart before the horse. So to me, it sounds like just because I don't prevail on my claim means I don't have standing. I ought to be able to make the argument. And so I don't know if it ends up being a distinction without a difference, but I, with respect, I don't think that's, I mean, if somebody says, you know, you, you, you stole 25 apples and the grocer says, well, I don't sell apples. You still, you know, you make the claim, but if they don't sell apples, then you have got nothing that is no basis for stealing and we didn't have them. Well, I would turn that analogy around and say, the person does sell apples. And I said that he stole apples. And just because I don't have documentary proof, there's some rule that says I don't prevail. It doesn't mean I can't come in and make the argument that, and that's what we were doing. We were presenting our ownership deeds and saying, You're arguing equitable apples. Well, the fact is we, we presented our, our deeds and for it to be, um, essentially called a meritless kind of argument that that's, you know, that doesn't give us standing. With respect, didn't the court say your argument is you own from the middle line of the easement. It's only on that basis that you own it. Your deed doesn't show that there is a want of meets and bounds descriptions that would eliminate that right. So you don't own anything from what you presented that interferes with the easement. It's very common. In fact, it's almost always the case that someone who lives next to a or highway for that matter, will have a deed that shows the boundary or a plant that shows the boundary as, as that easement. For obvious reasons, you wouldn't want that person thinking they could go cultivate that area or, or built, put a building on it. And so what, what defendants will commonly do in these kinds of cases is say, well, you weren't granted that land. Well, that's what the whole center line presumption is for is to say, if you live next to an easement, if you have, if you own land next to an easement, you're presumed owner of the center of it. So it fills that vacuum. It prevents remnants of basically going into a vacuum that no one really would, would hold on to. And so I think where we have deeds that are not a meets and bounds, and by the way, I would submit that King County vastly overreads what are meets and bounds descriptions and what, what is not. A meets and bounds, it's pretty obvious, it has to have boundaries, it has to have call outs. You know, this many feet from this post to this post, that's your meets, and it has to have, it has to have, I don't know, that's bounds, it has to have meets, it has to have a distance. How many feet? And additionally, under rotor, it has to refer to the railroad right of way as a boundary. And so there's an awful lot of deeds where King County just says, well, these are meets and bounds. No, they're not, when you look at them. Similarly, King County will say, any time there's an exception that that's a meets and bounds, they'll include those in those categories where I strongly contend that an exception just means subject to the existing easement. For the same kind of reasons, you're telling the grantee that you are allowed to own the land next to the easement, but it's subject to the rights of a third party. So you don't interfere with that. That's what the Zobrist case says from Washington. And Kershaw adopts that. So when you have an exception, you have to look very closely at what are they really trying to do here. It's not just a knee-jerk, well, that means you don't own it. No, they're putting the world on notice and the grantee on notice that there's another easement out there they can't interfere with. Well, let's talk about what the court did, if I understand it correctly. The court said, look, this is your burden. I ask you to produce this very early on. You're going to prejudice these defendants. You didn't produce it. It's your burden to show that you don't get your property by meets and bounds without evidence that that's not the case. You have no presumption that you're entitled to ownership of the land through the median strip. Therefore, you have no ownership that would give you standing. Why is the court wrong? I think for a variety of reasons, Your Honor, starting with the fact that for reasons we've already discussed, we don't think change should have been necessary. All we should have to do is present our ownership deed. The ownership deeds were all presented, the current ownership deeds. And so we think that should have been enough. In terms of the actual reading of the deeds, you have the secondary problem that I just mentioned of are these really meets and bounds or not? What's the effect of exclusions? See Kershaw and Zobrist. Those are other reasons. And then finally, there's the striking of the chains themselves. And we have a portion in our brief about that they shouldn't have been struck. We as counsel were given a sanction, a hefty one, which we settled and paid. And we don't think our punished for our delay, which we obtained the chains of title in January. We produced them in July. I'm sorry, June of the same year, five months later. Of course, there's some time to review those chains of titles. I would argue there's maybe a four-month delay. It's also at a time after we had lost on a summary judgment motion where we thought that we might be taking an interlocutory appeal or having many representative trials. And so not producing them was not intentional. We were not flouting. You just didn't think you needed them. I'm sorry? You didn't think you needed them. We thought we might not need them because we thought it was going to go away. And so this isn't a case where someone just found a document we've been hiding and we produce it on the eve of trial. A trial court's discretion is curtailed when you're going to give the death penalty, which this is what it amounted to, dismissing a case. And so we've cited some cases where there's been much more consistent and egregious conduct, which the Ninth Circuit reversed and said, no, you needed to look at alternative methods. And we don't think King County was prejudiced. They didn't even need an extension of time to file their reply. So if it comes to that, we would certainly ask that they not be struck and that they be allowed an evidence. We think at a minimum, there's factual questions if we have to go back. Well, after the court ordered you to produce the chain of title, what did you do? Did you go out and try to collect them or did you tell the court we're having trouble getting these or why was the court concerned that you just hadn't responded? Well, what happened was we lost a summary judgment motion in October. Around that time, I think it was a little bit before, maybe we had lost on the discovery issue about whether we needed to produce to get change of title. So when we lost on the summary judgment motion, there was a question of, well, what are we going to do now? Are we going to go spend, you know, $100,000 plus of our client's money ultimately to get these chains when it doesn't look so good? So we just, we made the strategic decision after meeting with the steering committee of plaintiffs to get four chains as representative chains. So you made the strategic decision that you weren't going to comply with the court's order to compel? No, no, no, no. We made the decision, we didn't have them at the time. We didn't have chains of title when the court ordered us to produce. So we had to go out and get them. So we didn't get them until January of 2016. And so you didn't do that until after you lost the summary judgment motion? Yes. Yes. And that was a partial summary judgment motion. And so there were more issues that came up later in the second round of summary judgment motions. And that's when we, we responded and involuntarily produced the documents. So we certainly never had any type of intention to withhold documents and not produce. The court obviously felt differently. We review that for abuse of discretion, right? Well, yes. And we're not here talking about the sanction against the attorneys, though. We're talking about the sanction against... No, I understand that. And there, the discretion is curtailed. Why? Well, the... How is it curtailed? The RR, I'm sorry, the Enri Rubin case, which we cited in our brief, says discretion is curtailed because dismissal is a sanction of last resort. In the, I don't know how to pronounce it, Fijelstad case, 762 F. 2nd, 1334, the Ninth Circuit reversed the imposition of a default judgment, which there is a long history of repeated discovery abuse. And so that's how it's curtailed. Well, I'm still confused. The court granted the motion to compel. You had a, you had an order from the court to compel the production of these documents. Yes. We didn't have them at that time, though. I know you didn't, but there's an order from the court. Did you, did you, what did you do in response to that? We went out and got four chains. I mean, I, I think that first of all... Why did the court feel that, that you hadn't responded then and issued the sanction? Well, I think the court's issue with us in that regard was that there was, when we obtained, after we obtained the chains in January, that we didn't produce them until June. Why? Why did you wait until June? Your Honor, it was, it was simply a matter of getting distracted with the, the press of business and, and not having on the mind, our minds. It wasn't, there was no intentional decision. It was just an oversight. Okay. So the court's order was July of 2015 and you produced them in June of 2016? No, I think the court's order on discovery was in the fall of 2015. But that's only documents in our possession and control. And so we went out and got documents to be in our possession and our control over the next few months. Okay. And then we had a five-month delay in producing, once we obtained them. And the five-month delay was just an oversight? Yes, Your Honor, it was. May I reserve my time? Sure. Thank you. Very well. Now we've got three lawyers. And I guess Ms. Harris, you're first, and you have eight minutes. Yes, Your Honor. You'll notice the trap door right behind the... I'm going to be trying to go quickly because I have a lot to say in my eight minutes. First, to correct the record in the prior case in Hornish, plaintiffs said that the chains of title were in the record. However, the chains of title were attached to the declaration of John Rall, and the court struck John Rall's declaration as part of the proceedings in that case, and the plaintiffs have not appealed that issue. So they're not in the record from your perspective then, right? That's correct. Your Honor asked a lot of questions about the Haggard case. It is true in the Haggard case that the plaintiffs are going to receive a settlement of $110 million, which is approximately $350,000 per parcel. Our expert, Mr. Greenleaf, opined that that is essentially the fee value of those portions of the right-of-way. That is unopposed evidence below. It is because what is being taken or what is not reverting is a substantial right that includes subsurface aerial rights. And we know that that's the case because in Haggard, the court there talked about the fact that it was including Sound Transit's possible passenger trail use as an interim use. We also know about it because in a related case, I Apollo, these same plaintiffs brought an inverse condemnation class action against King County and these defendants for their subsurface and aerial rights. That case was dismissed because the court concluded that they were already receiving compensation for the subsurface and aerial rights in the Haggard case. And the plaintiffs did not appeal that decision. Can you clarify this for me, counsel? Sure. You indicated what is not included. You said that there was a fee interest that was taken. Can you help me with this? Was any portion of the land to the middle of the easement included in the award that the Court of Federal Claims has made? So in the Federal Court of Claims, it's not that the fee was taken. What is being taken is the railroad easement. It's being stopped from reverting to these landowners. And the contribution to that in the takings case is essentially a fee value because the easement is so substantial. But see, that's where I'm having some trouble. As I look at this, and obviously there's not a really great map of it, but it looks like you have little piece, little piece there, no big deal, unless you have the right to get to the middle of the easement. Then you're talking about some substantial property. It almost looks to me like the Court of Federal Claims in the settlement, nobody really specified this, folks are being compensated for the taking of their interest in property up to the middle of the easement. Is that correct? Well, either the middle of the easement or the entirety of the easement. I think there is... Either way, though, it is contrary to the position of the county. It is contrary to the position of the plaintiffs in this case because the plaintiffs here are rights have been taken in Haggard, and we're going to compensate a lot of money there, but we're going to come here in this court and argue that we get to still control all of those rights. And perhaps I misspoke. What I meant to say was, if I understand it, the county's position is, based upon the Trails Act, all these state interests get stopped. But they don't really go to the middle of the easement. Some of them have a little bit of this, and some of them have a little bit of that, but not much. And in any event, it's all the prescriptive easement that we have overcomes all of that. So you have to take something, and the Court of Federal Claims concluded that something had been taken. I'm just trying to understand what did the Court of Federal Claims think was taken? I believe the Federal Court of Claims believes what's being taken is the railroad easement reversionary interest that would be for the rail corridor. Regardless of whether these people could actually satisfy the centerline presumption under Washington law or not, they're going to be compensated for it in the Haggard case. So they're being compensated based upon the possibility that they might own something. Well, as part of this settlement, because the court has not fully litigated this. I understand, but I mean, they had to be compensated for something. Yes. Nobody specified, but apparently they're being compensated for something that they might own. Yes. And it's a lot of money. It is. Okay. It is. With respect to the centerline presumption, I would just like to point out a couple of things since that's come out in argument. In Caseburg, this issue was raised and litigated as part of King County's motion for summary judgment. So we had asked for these chains of title in discovery. We didn't get them. We brought up our motion for summary judgment, which raised the fact that their current deeds, which we had, showed that they excluded the corridor. And as part of the rebuttal to summary judgment, they came forward with four chains of title, four chains of title which had not been previously produced. And so when we're talking about the centerline presumption in this case, what we find is there was, in the end, no material question of fact about whether they could use the centerline presumption because the court found that they had not come forward with sufficient evidence for the vast majority of plaintiffs. Now, even with respect to the four chains of title... Getting to that then, from your perspective, I gather the court's as well, it was essential that the plaintiffs produce the chain of title in order to be the beneficiaries of the presumption. Is that right? Well, that's part of it, Your Honor. Actually, the chains of title tell us a lot more than just the centerline of presumption. And so what we learned from one of the chains of title was a deed that nobody had ever seen before that showed that the predecessor to the Garden of Eden plat, which is a substantial piece here, had actually, there was a prior deed that had deeded all of that land for the right-of-way previously. And so when the Hillman had it, he didn't actually have anything to convey. And so that is a deed that we didn't know about, and certainly it would have changed the way that we argued summary judgment. So when there was a request for production of documents to the plaintiffs for the chains of title, it was for more than just the presumption? Correct. It was relevant for other issues? Absolutely. And did that discussion ever come up during the discovery dispute as to why you want these? Yes, it did. It was precisely for these things of trying to understand what had happened over the course of the history of this land to make sure that all of us understood fee and easement questions that were coming up, who owns the revisionary interest. So, for instance, we know things like there is a condemnation. And the question is, everybody understands that's an easement, but who holds the easement? Is it these plaintiffs or is it the State of Washington? Same for the Lake Washington Company deed. There are issues about who, you know, and so the chains of title are critical for us understanding all of those issues. So it just is not just the centerline presumption. Do you remember which person it was that had conveyed the easement in the chain of title, if you recall? The conveyance of the actual railroad easement at an earlier point? It was a Lake Washington Company deed to the railroad, I believe. I'd have to go back and check the record on that. I have very little time left. You have no time left. How much more do you have to say? Well, I could talk. I love this railroad stuff. Well, let's do this. We'll give you half a minute for your most sterling argument. How about that? I think the plain language of the Trails Act, which is really critical here, the plaintiffs omit in their brief and in their argument to this Court that the plain language of the Trails Act actually supports the fact that King County has the railroad easement. It's the language that's omitted. It says the trail sponsor shall have full responsibility for management of such rights-of-way, legal liability arising from such transfer or use. And those two sentences refer back to the preceding paragraph, which talks about such rights-of-way for railroad purposes. It's clear, and the Elig case makes it clear, that the railroad easement is actually being passed.  We'll now next hear from James Breitenbucher of Puget Sound Energy for five minutes. Good morning. Jim Breitenbucher on behalf of Puget Sound Energy. I would like to address the District Court's order granting summary judgment to Puget Sound Energy under the Incidental Use Doctrine. The parties here all agree that BNSF held at least a railroad easement through the disputed corridor. This is significant because railroad easements provide the holder with the exclusive possession and control over the corridor necessary for an intensive use like constructing and operating a railroad. Now given the fee-like nature of these railroad easements, Washington courts have held that the railroad operations, including utilities. This is known as... Is there a case that says utilities? There is. There is the Kershaw case. In the Kershaw case, the Court of Appeals addressed whether telecommunication equipment was an incidental use of a railroad corridor. And in that case, the court said it was. Now on appeal to the Supreme Court, the Supreme Court reversed, but not on that grounds. The Supreme Court said this telecommunications company was required by state statute to proceed under an eminent domain theory and couldn't get it by purchase. And so ultimately reversed that decision. But then later on in the Washington Securities v. Horse Heaven case, another Washington Court of Appeals case looked at it, said there's no indication that the Washington Supreme Court disagreed with anything about the incidental use doctrine analysis of Kershaw and readopted it in a fiber optics case. So there's... The question I had before, maybe you can help me, is that if the railroad owned a fee, I get your point under Washington law, but let's say the railroad only owned a prescriptive easement as to a particular piece of property. Long comes the trails, act, the county or the port takes it over, it got what the railroad owned, which was a prescriptive easement for railroad uses. Are you saying that under the incidental use doctrine of the state of Washington that even though all you had was a prescriptive easement which was used to do certain specific things by virtue of the nature of a prescriptive easement, the incidental use doctrine can expand that to include whatever may exist now that probably nobody even thought of in 1890 or whatever? Well, first of all, if it's a fee... No question about fees. Okay, yeah. So the answer is yes. If that prescriptive easement provided the equivalent of a railroad easement, then the incidental use doctrine 100% applies. One of the arguments that we hear from the plaintiffs is, well, we don't think that these are incidental uses. These are, you know, big power lines and such. But the incidental use doctrine does not focus on what the adjoining property owners think of the use. It focuses on whether the use is incidental to the railroad operations. And on that, the test is clear. Is the power lines, sewer lines, et cetera, inconsistent with railroad operations? And on this point, I think it's important to note that since the mid-1900s, PSC and its predecessor companies have been obtaining gas and electric utility rights through the corridor without objection under the incidental use doctrine. Others have obtained sewer lines, water lines, the right to put in fiber optics and telephone lines. So this corridor has, to use the bundle of sticks analogy, a bundle of utility sticks where the plaintiffs say, oust those uses from the corridor because it's been rail banked with no explanation of how that should be handled. And we'd submit there's nothing in the Federal Trails Act when it's talking about preserving the railroad right-of-way that indicates any intent to oust incidental uses which could provide income for the trail operator to maintain the trail as well as preserve the corridor for possible reactivation as a railroad. Can you cite me any case involving what your company, Puget Sound Energy, does where the easement was a prescriptive easement but you were given a right to do something like fiber optics? Anything like that? I can't tie it back to a prescriptive easement. Our argument depends on that prescriptive easement conveying the equivalence of a railroad easement. So basically, from your perspective, you're asking us to construe a prescriptive easement which is the way the railroad got it in my hypothetical. Make it essentially the equivalent of a fee. Well, the prescriptive easement for railroad operations. No, I'm not saying make it the equivalent of a fee. That's not what it says. They claim a prescriptive easement. It's not really described. They just used it. And they got that interest in that way. It's not a document. They ran a railroad. Yeah, and once you run a railroad because at least the case law, I would argue, supports applying the same incidental use doctrine because when you run a railroad, you build bridges, you tunnel, you need to keep people away from the tracks. You're subject to potential liability if someone goes on the tracks. So operating a railroad requires exclusive possession and control. Washington law supports that use of the railroad corridor, and I think it takes you straight to the incidental use doctrine. Questions by my colleague? All right. Thank you very much. The final counsel for the defense is Matthew Siegel from Sound Transit. I'm always glad to hear that transit is sound. So are we, Your Honor. Good morning. May it please the Court. Matt Siegel from Pacifica Law Group for Sound Transit. As the late Judge McDonald in the Eastern District of Washington used to say, that he was farm raised and the ground had been well plowed. I think we're probably at that point today. So I'm happy to answer any of those. You want to sit down then? It's okay. I may sit down before the end of my time if the Court doesn't have questions on this. We want to post that. I did, first of all, want to emphasize that there are no prescriptive easements at issue in this case. There are none, you say? There are none. And with respect to the corridor that Sound Transit's rights derive from, there are two source documents. They're both in the record, transcripts and the originals. That's the Beltline Deed and the Condemnation Judgment. And so those are where the rights derive from. There's also no dispute with respect to Sound Transit's portion of the corridor that this is a rail easement and that we wish to use it for rail purposes, namely passenger rail, which was incorporated within the language of the original rail easement. Is your particular easement the one that was moored down by the water and was acquired differently than some of the rest of it, or is that a different one? Well, we're along the east side of Lake Washington as you head south towards Renton. That's the portion of it. And the ER 900 series has a list of maps that shows the exact segments of that corridor. And in that respect also, there's no issue with that particular portion of the corridor about whether the ownership is in easement or in fee. In other words, we agree it's in easement. Now, the court asked what was taken, and I think that's also a critical question because it really does defeat the interpretation of the Trails Act that's being urged by the appellants. What was taken is the interest that would have reverted back to those plaintiffs from this easement had the easement been abandoned by operation of state law, namely the Lawson case, which was discussed in the Hornish decision. And so if that state law had been applied without the benefit of the Trails Act, then what would have happened is they would have received essentially a fee interest back in the entirety of that area that's otherwise subject to the easement. But they did not. And so the U.S. Supreme Court in the Preysalt decision said that can be a taking because you're denied your reversionary interest. The Court of Claims has then refined that further and said the taking occurs when the need-to is issued. It might be temporary if there's not a trail agreement reached, or it might be permanent if there is one reached. And in this case, there was one reached, and they were compensated. What were they compensated for? This is also really critical. And if you look at the Haggard decision, you see they were compensated for an after interest, which is their property burdened by an easement that includes not only trail use, but also light rail or commuter rail. And that's critical because you'll see in some of these Court of Claims cases cited in the briefing here that the U.S. government initially had said, well, really you should only be compensated for a property burdened by a trail. And the Court of Claims has said, no, no, that's not true, because there's also utilities or there are other interim uses there. And so you get paid for that, too. And they have been. In your view, that would recognize, in effect, the incidental use doctrine that you all have talked about. It would. Sound Transit does not need to rely on the incidental use doctrine, but I agree that would. And also I think as the agency tasked, excuse me, as the entity tasked with implementing the Trails Act, the STB has frequently recognized uses for utilities and also uses for interim light rail transit streets. We've cited a number of those administrative decisions in our briefing. The Baltimore and Ohio decision is probably the most significant one, but there are many. And what they show is that these types of projects are taking place all over the country. In other words, you have these corridors being preserved. There's a lot of value in the corridors being preserved. Multi-jurisdictional efforts are made to preserve the corridors and to not only create the trail, which is really only one component of the Trails Act, but to fund preservation of that area and maintain it for possible reactivation. And how do you do that? Trails don't necessarily pay for themselves. And so you do fund that with other types of interim uses if those uses were allowed under the state law instrument at issue. And that can be light rail transit. It can be utilities. It can be roadways, all sorts of things. And the STB's qualifications are only two, and that is don't conflict with the trail use and also don't prevent the possibility of reactivation for interstate freight service. Do you have any comment, and this is a little field of sound transit, but one of your colleagues, I believe, in either this or the other case, talked about how there were special use permits that were granted and that the very fact that those have been granted to some of the plaintiffs is evidence that they recognize that the county in that case had interests that permitted them to use the property. These people used the county's property. Is that a fair analysis? I am not familiar with the granting of special use permits by the county, because you're correct, that doesn't really apply to our use. I think what Puget Sound Energy was saying, if this is what the court's alluding to, is that there were uncontested or unobjected to uses of the corridor by utilities and also, for that matter, for passenger service over the past 100 years. And if the court's asking why is that relevant, the answer to that would be that under Washington state law, the subsequent conduct of the parties and the successors does serve as evidentiary value to interpret the scope of an easement. And so if you've seen that type of activity going on for an extended period of time, without objection in particular, that's considered to be further evidence that that is something that was contemplated as within the scope of the easement. So I would also finally add, Your Honor, that there was a summary judgment motion brought by Sound Transit, granted by the district court, confirming that Sound Transit, this is a separate motion, had rights that included not only surface rights but aerial rights and subsurface rights consistent with the normal and necessary operation of a railroad. That grant of summary judgment is not challenged on appeal and should be affirmed. It's also correct on the merits for the reasons stated in our brief. And so with that, unless the court has further questions, I request that you affirm. Thank you very much. All right. Counsel, the big windup. The big windup. If it pleases the court, I'd like to make three quick points and then also answer Your Honor's earlier question about Grable in a little bit more detail if I could. Number one, there was a reference to Hornish about a declaration being struck. The chains were not struck. The source evidence was not struck. The chains are still in evidence. Where should we look in the record to see that? That's Hornish Trial Docket 31 starting at Exhibit B. Exhibit A was the declaration of a title examiner who had some opinions that were struck but not the source evidence. You're sure? I believe so, Your Honor. I don't recall any order that the chains themselves were struck. Usually the court would just say, you know, this evidence has, you know, I think there was a question about the foundation and the court just struck it. I don't remember saying except for the attachment. This was about whether his opinions invaded the province of the court. Right, right, right. About whether they showed defeat, yeah. But I don't remember the court saying that. I certainly don't recall the chains themselves being struck up. If the court did strike the whole thing, then you would agree that it wasn't in evidence, right? Certainly if they struck the evidence. No, I just wanted to make sure. Then I'd say, yeah, right. Some lawyers say interesting things. They do. The second thing I'd say about prescription is all the stuff about special permitting, other deeds, the use is the use, and that's your limitation of the easement. And that was established 100 years ago, and that hasn't changed. That use has been the same. So no matter what somebody is saying, even a plaintiff is saying about what I think the boundary is, the use is the use, and that's the easement. So you heard the argument by distinguished counsel that incidental use is part of Washington law and there's a lot of case law to back it up. What's your response to that? Well, I think it's not fully developed. I mean, just judging by the Kershaw case, it was sounding from counsel like he was going to say, yes, utilities, they've been approved, and then he says, well, but it was actually reversed on other grounds by the Supreme Court in Kershaw. So I think there's a lot of unanswered questions about incidental uses in Washington. Well, that's not the only case, though, is it? I'm sorry? That's not the only case dealing with this. No, it's not the only case, but what I would say here, and this actually highlights the subject matter jurisdiction argument that we're making, is that their incidental use doctrine depends on there being an existing railroad easement. And so in response to that defense, we say it was extinguished when trail use was allowed. That's why there's no incidental uses allowed. It's because trail use, which Lawson says is beyond the scope of a railroad purpose easement, that's what extinguishes it. On the issue of subject matter jurisdiction, if I could just very quickly, my time is running out on Grable. Grable, the reason jurisdiction was found there was a quiet title action, and the plaintiff said that the IRS had given insufficient notice for a tax sale, and the court said plainly this doesn't arise under federal statutes. However, the Grable type jurisdiction that was created was to say there's a substantial federal interest in having tax issues litigated in federal court. Here, there's no federal substantial interest, which is a special category, a small and special category of cases. There's no substantial federal interest because this is about local infrastructure and whether it's going to be put in. No one's trying to stop the trail. Believe me, the Trails Act is going to go on fine and well. It's a grassroots effort. They're being converted all over the country all the time. Nothing about this case is going to affect that. Thank you, counsel. Thank you. Any other questions by my colleagues? We thank all counsel. Your arguments have been very helpful. We are grateful to have the audience that we have today, and hopefully you have found this. At least you can see what courts of appeal do, at least in public. The court is adjourned for the day.
judges: M. Smith, Watford, Rayes